IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MELISSA WATSON,                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )  **CASE NO. 05-CV-2014 JPO**
                                         )
THOMAS L. TAYLOR, M.D.                    )
                                         )
                    Defendants.          )

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE

Plaintiff moves the Court to instruct defendant, defense counsel, and all of their witnesses not to mention, refer to, interrogate concerning, or attempt to convey in any manner, either directly or indirectly, at any stage of these proceedings, including voir dire, within the presence or hearing of the jury, any of the following evidentiary matters, without first obtaining permission of the Court outside the presence and hearing of the jury. Further, plaintiff requests that defendant and his counsel are to instruct and caution each of their witnesses to strictly follow the same instructions. In support of this motion, plaintiff suggests the following:

### I.  Background – Summary of Case

This is an action for medical malpractice. Defendant Thomas Taylor, a general surgeon, performed an exploratory surgery to look for and repair a suspected hernia. No hernia was found. The defendant then decided during the surgery to cut and remove part of plaintiff's ilioinguinal nerve (the nerve that innervates the left side of her groin and vulva), a procedure known as an ilioinguinal neurectomy. According to defendant's operative report, during the surgery he chose to do an ilioinguinal neurectomy "because of the patient's pain pattern."[1]

---

[1] The consent for the operative procedure lists only the possible hernia repair, and does not mention any ilioinguinal neurectomy. Plaintiff denies ever discussing, let alone giving verbal consent to, such a procedure. Defendant claims

Postoperatively, plaintiff developed severe, burning sharp pain in her inguinal area. While she had pain in her inguinal area prior to the surgery, hence the need for the operation, her pain worsened substantially post-operatively. The pain was so bad that she asked for another operation and was re-explored by another surgeon. Eventually, she was evaluated by a pain management specialist, Dr. Patrick Griffith, who diagnosed her with neuropathic pain that he attributed to the neurectomy. She has undergone extensive treatment since the neurectomy, and has obtained some relief, but overall her recovery has been poor. She is now permanently and totally disabled from the chronic pain resulting from her neurectomy.

Her pain from the neurectomy is a burning, constant and intense pain in essentially the distribution of the ilioinguinal nerve, the area of her lower groin on her left side, radiating into her thigh and into her back, perineum and vulva. It hurts to walk, so she favors her left leg, resulting in a limp and necessitating the use of a cane most often. Her pain, altered gait, and side effects from medications has resulted in additional problems for her, including constipation, sore feet, sore back, fatigue, disrupted sleep, confusion. The overriding problem is the intense pain into the left side of her groin area, particularly near the crease between the thigh and torso. She requires large and continuous doses of narcotic pain medications to lessen her pain. There is no cure for her condition.

Prior to the neurectomy, plaintiff had been having severe pain in the inguinal area since she strained it at work on October 12, 2002.[2] She had a history of abdominal discomfort relating to her pre-existing medical condition of interstitial cystitis (IC). IC is an inflammatory condition of the bladder that causes problems with urination and can cause abdominal pain and discomfort.

---

he discussed possibly cutting her ilioinguinal nerve, but has no recollection of informing her that a risk of the procedure was chronic pain.

[2] This was explained to defendant at the very first office visit. Moreover, her urologist's records through the spring and summer of 2002 do not show any left inguinal groin pain until October 16, 2002 (after her work injury).

The symptoms can wax and wane, and vary dramatically from person to person and over time within the same person. Plaintiff had a history of repeated urinary tract infections, which is typical of patients with IC, and which also cause abdominal discomfort. She also had a history of ovarian cysts that caused pain and required surgery. Plaintiff's evidence will be that the nature and character of her pre-existing condition was dramatically different from her current condition caused by the defendant's malpractice. While she still has IC, it is well controlled by diet alone. She now has chronic pain from the neurectomy, a known risk of severing a sensory nerve.

While plaintiff had a history of abdominal pain and/or discomfort prior to the surgery, the neurectomy made her condition worse. Previously she was able to care for her children and hold down a job. Although sex could be painful, there were things she could do to deal with the discomfort. Postoperatively, sex became virtually impossible. The pain from the neurectomy became so bad that she had to quit her job as a waitress and she is now disabled. Her quality of life has diminished dramatically.

Approximately June 23rd, 2003, plaintiff filed a workers' compensation claim as a result of her groin strain. In fact, plaintiff had been referred to Dr. Taylor by her work comp physician. His treatment was paid for by the work comp carrier. In Missouri, where the primary injury is aggravated by medical treatment, without fault of the employee, there is a causal connection between the original injury and the resulting disability. *Jennings v. Charles,* Case No. ED 86771 (Mo.App.E.D. 2006). Thus, the harm caused by the neurectomy is also a part of the comp claim, and the carrier has provided and continues to provide treatment for plaintiff's neuropathic pain. The comp claim is still pending. The instant action was filed against defendant in January, 2005. The employer and work comp carrier have a subrogation interest in this action pursuant to

§287.150, RSMo, for all treatment they have provided and will be required to provide in the future as a result of the defendant's malpractice.

Plaintiff also has seen various physicians in the past for reasons unrelated to abdominal pain, including intermittent back and neck pain, mammograms, colds, and dental work. The parties have amassed voluminous medical and business records dating back to 1994. These records are replete with references to insurance and workers' compensation. They record numerous events and medical treatment that are irrelevant to this action, the admission of which would be unfairly prejudicial to plaintiff's case. They also contain inadmissible hearsay statements. The parties have agreed to foundation on numerous records, but have reserved their right to make objections on other grounds. These records/entries/conditions are discussed below in detail.

I.     **COLLATERAL SOURCES: Evidence of Collateral Source Payments, including amount of Social Security Disability Benefits, Health Insurance, and Worker's Compensation Insurance/Benefits should be excluded from evidence.**

As Judge Vratil has succinctly stated:

> The collateral source rule provides that benefits which plaintiffs have received from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer. *Gregory v. Carey*, 246 Kan. 504, 507, 791 P.2d 1329 (1990) (citing *Farley v. Engelken*, 241 Kan. 663, 665-66, 740 P.2d 1058 (1987)). An injured party is therefore entitled to full compensatory damages from a tortfeasor irrespective of the payment of any portion of those damages by a source independent of the tortfeasor. *Wendtling v. Med. Anesthesia Servs.*, 237 Kan. 503, 515, 701 P.2d 939 (1985).

*McCoy v. Whirlpool Corp.*, No. 02-2064-KHV, fn2 (Kan. 2003). The collateral source rule, therefore, "precludes admission of evidence of benefits paid by a collateral source." *Wendtling*, 237 Kan. at 515.

The admissibility of evidence in diversity cases in federal court is generally governed by federal law.  See eg., Romine v. Parman, 831 F.2d 944, 945 (10th Cir. 1987).  If an evidentiary question is intertwined with a state substantive policy, however, state law applies.  See eg., Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917, 930-33 (10th Cir. 1984) (in diversity case, Kansas law controls admissibility of evidence of subsequent remedial measures).  Judge Vratil has determined that the "[a]pplication of the collateral source doctrine, while an evidentiary rule, is closely tied to state substantive policy, and thus is governed by Kansas law." Strahley v. Mercy Health Center of Manhattan, Inc., 2000 WL 1745291 at * 2 (D.Kan. 2000). Under the collateral source rule, the fact that Medicaid and private health insurance paid plaintiffs' medical expenses is not admissible.  Id.

Accordingly, benefits that plaintiff has received, including work comp benefits (temporary total disability benefits, payments for medical treatment, and the fact that the work comp carrier has provided and is providing medical treatment and paying for treatment and prescriptions), health insurance, and amount of social security disability benefits should all be excluded from evidence as sources of benefits collateral to the defendant.

Further, evidence of such benefits and the fact of insurance is highly prejudicial.  Plaintiff is making claim for a future lifetime of medical care necessitated by defendant's negligence. Evidence of work comp insurance or the existence of her work comp claim would unfairly prejudice plaintiff in the minds of the jurors, who would not be aware of or understand the social policies underlying the collateral source rule, likely resulting in a diminished recovery.   Such unfair prejudice far outweighs any probative value such evidence may have.

Plaintiff's objections in this regard are intended to include Dr. Danner's recent testimony in which she refers to insurance (the transcript is not available at the time of this writing) as well

5

all such references in the medical and business records and bills in this case. Dr. Danner, in her testimony, was referencing her medical record entry of Dec. 31, 2002:

> [Plaintiff] states, because of social restraints, the *insurance* is in her name and she needs to present to work a certain number of hours to keep this, and because of these reasons, she has elected not to pursue any intervention until February.

Page 070155 of the North Kansas City Hospital records. This evidence and testimony relating to it should be excluded in that any probative value it may have is far outweighed by its unfair prejudice. There is no harm to excluding, as in point of fact the surgery was not delayed due to insurance issues. Plaintiff was seen two days after this entry by defendant himself who recommended against surgery, and it was postponed then at his instigation until Jan. 27th, after a failed attempt at physical therapy to treat plaintiff's severe inguinal strain.

The voluminous business and medical records in this case are replete with references to insurance. Plaintiff requests the Court to instruct that no such references to insurance or collateral source be shown to the jury, that defense counsel be precluded from referring to such insurance or collateral sources, and that the defendant caution his witnesses accordingly.

## II.     Evidence of Filing a Worker's Compensation Claim, retaining an Attorney, or otherwise pursuing plaintiff's legal rights should be excluded, and defendant should be precluded from disparaging plaintiff's right to pursue her legal remedies.

In the pretrial order, defendant contends that after plaintiff "hired a lawyer and filed a workers' compensation claim" she claimed her pain worsened. Defendant's expert, Dr. Chris Fevurly, contends that people who have work comp claims are not motivated to get well, and therefore have a secondary gain that serves as a psychological incentive to stay sick. Defense counsel also inquired of some of plaintiff's treating doctors as to their familiarity with studies that suggest that people with claims take longer to get well than those who do not. By these

means, defendant intends to suggest to the jury that people who are injured and seek to pursue their legal remedies, file a work comp claim, hire an attorney, or sue, are therefore not really hurt or are otherwise disingenuous.

Evidence that plaintiff has filed a worker's compensation claim, accessed the legal system, or otherwise pursued her legal rights should be excluded, and should not be the subject of disparaging comments or argument. Access to the legal system is a *fundamental right* and should not be discouraged, and exercising one's right to utilize the legal system within established rules and procedures should normally not be used to discredit a litigant with a jury. See *eg.*, *Carlyle v. Lai*, 783 S.W.2d 925, 929 (Mo.App. 1989) (evidence of when plaintiffs hired an attorney was prejudicial error because it constituted an attempt to discredit the plaintiffs as avaricious for seeking legal advice shortly following their son's death).

Such evidence should be excluded under Rule 403. By excluding such evidence, our courts "acknowledge the paramount importance placed on preserving an individual's freedom to exercise rights fundamental to or granted by the legal system" and that "injection of a party's exercise of her legal rights is an improper issue for trial...." *Yingling v. Hartwig*, 925 S.W.2d 952, 957 (Mo.App.W.D. 1996) (evidence of secondary gain prejudicial and reversible error).

In addition, plaintiff may be unfairly prejudiced in that an incorrect inference could be drawn from the fact that plaintiff's work comp claim is pending. A jury may not appreciate the fact that plaintiff is entitled to claim some of the same damages in the pending comp claim as are claimed here. A jury may not understand that the work comp carrier is subrogated in this action, and how that effects plaintiff's overall recovery for her injuries. A jury may be more likely inclined to deny plaintiff recovery in this action, believing that she is already being provided for in the work comp action.

**III.** **Evidence and Argument suggesting that plaintiff is not motivated to get well due to secondary gain, or other such evidence, should be excluded.**

For the same reasons as Point II above, evidence of so-called "secondary gain" should be excluded. In this case, defendant has injected the theory of "secondary gain" by (1) repeatedly eluding in deposition to the theory of secondary gain with repeated references about patients involved in litigation and the potential effect on their recovery, (2) the opinions of Dr. Chris Fevurly, defendant's retained expert, concerning "chronic disability syndrome" and "why pain-related disability and litigation are such major problems" and (3) by inference in defendant's contentions in the Pretrial Order. Such evidence is irrelevant and any alleged relevance it may have is grossly outweighed by its prejudicial effect, and therefore should be excluded. Rules 402 and 403.

Instructive on this issue is the case of *Yingling v. Hartwig*, 925 S.W.2d 952 (Mo.App.W.D. 1996).[3] In *Yingling, Id.* at 954-55, similar testimony was adduced, as defendant has in this case:

Q: (By defense counsel, Mr. Karaim) In your twenty years — or pardon me — whatever, twenty — sixteen years you have been in orthopedic surgery, you've examined persons who are not involved in litigation; correct?

A: (By Dr. Neighbor) Yes.

Q: And you've examined persons like Ms. Yingling who are involved in litigation; correct?

A: Yes.

Q: In your opinion, Doctor, and based on your experience, is there any difference in the nature of the subjective complaints made between people not in litigation and people who are in litigation?

A: Yes.

Q: What is the difference, Doctor?

---

[3] Plaintiff could not find any Kansas case law on point.

A: Patients who are involved in litigation tend to have their subjective complaints last considerably longer. If they're employed, they tend to work a lot longer to get back to the work situation. They just go on a longer period of time.

Q: And those are observations you've made in your twenty some years of experience, correct?

A: Yes.

   ***

Q: Doctor, based upon your five-minute examination, why do you feel that Ms. Yingling can expect to have any improvement in her condition?

A: Well, I think that she has a completely normal range of motion. She's very limber. She has no evidence of any neurological problems. She's seventeen years of age. She was fifteen when this accident happened, which really rules against any permanency in any injury she had. And my experience is that as people get through their litigation and move on, they improve with their subjective complaints.


In closing and opening, based on Dr. Neighbor's testimony, defendant Hartwig advanced

the following arguments:

And about this idea that she has got permanent problems, he says, Look, she is young, she is going to do better. And he goes one step further. He goes on to testify that when people finish their lawsuits, they tend to get a lot better. He's been doing this for 20 years, being an orthopedic surgeon, and he's seen people come through who are in lawsuits and those who are not. And he will testify under oath that when people get done with these lawsuits, and when you can't find anything wrong with them, they tend to get better. He says she is truthful. He doesn't call her a liar. But he says that sometimes when you focus on the lawsuit and you are asked a lot about it, you tend to prolong your complaints. It's hard-hitting testimony from a reputable doctor.

Sure, she was stiff and sore all over, had a sore neck and back. That happens in every accident. And, as you heard Dr. Neighbor say, most people who aren't in lawsuits get better in a couple of weeks when they are not looking for a lot of money, not going to come in and say, I want $35,000.

The Missouri appeals court found that such testimony and argument was "highly

prejudicial" and should have been excluded. *Id.* at 956. The court found that such generalized

statements about lawsuits and litigants had no place in the courtroom. The testimony, the court

reasoned, was in essence a comment on the plaintiff's credibility, "a statement that plaintiff's generally falsify their subjective complaints for the purpose of furthering their lawsuit and increasing their damages." *Id.* Even gratuitous comments that a plaintiff may be otherwise truthful, "fails to diminish the prejudicial impact of the repeated references about plaintiffs involved in litigation and their prolonged subjective complaints." *Id.* Such testimony is irrelevant, highly prejudicial and should be excluded. As the court reasoned, as in *Carlyle*, such testimony and arguments are extremely prejudicial, and improperly inject the plaintiffs' exercise of their fundamental rights before a jury.

Defendant is taking an identical tactic in the case at bar, and has announced his intentions to the Court in his Pretrial Order Factual Contentions: "However, when she later hired a lawyer and filed a formal claim for workers' compensation, plaintiff claims her pain worsened, and became "different". Defense counsel has also inquired of treating physicians in this case as to their familiarity with the general idea or studies relating to secondary gain, the prolonging of physical complaints due to pending claims.[4] Such evidence is highly prejudicial, has no place in a court of justice, and should be excluded under Rules 402 and 403.

---

[4] For example, **Dr. Shavonne Danner** – whose transcript is unavailable – was examined at length regarding this issue. **Dr. Steven Hendler**, plaintiff's current treating work comp doctor was asked by defense counsel: "Is there, in fact, medical literature that indicates that sometimes there is more symptom magnification when there is an active claim pending, and that the patients sometimes get a little better once they have the money paid to them?" A. Well, I don't know how much literature there is specifically to address the latter part of your question. I would say there's literature to suggest that outcomes and degree of symptoms are different for people who are making Workers' Compensation claims than they are for people who are not making a Workers' Compensation or other litigation-related claims. But in terms of whether truly symptoms diminish, specifically after closure of the file, I can't say. I have to say that given the number of patients I see for long-term management where their files have been closed, I'm not sure that the symptoms -- I wish sometimes that that were so, but I can't say that that's consistent with my clinical experience per se." [Hendler depo p. 56]. Again, the following exchange occurred during the deposition of **Dr. Patrick Griffith**, plaintiff's pain management physician: Q. And in your practice do you find that patients with litigation pending who are seeking money from an injury tend to relate problems to that event that they're seeking money for? A. I think it's well-documented in any -- anybody's practice that any time there's a secondary gain issue, that's going to obviously cause -- it will obviously weigh or have an influence on outcome. Q. Is it human nature, and I don't intend to imply that she's lying or anything like that, is it human nature if you can, and this is in your professional practice, if you can gain money damages if your symptoms are one way as opposed to some other way, do people in that situation tend to remember things which helps them get money? A. Sure. Defendant's retained

Arguments designed to appeal to local prejudice should not be tolerated.

Trials before juries ought to be conducted with dignity and in such manner as to bring about a verdict based solely on the law and the facts. Hence reckless assertions unwarranted by the proof and intended to arouse hatred or prejudice against a litigant or the witnesses are condemned as tending to cause a miscarriage of justice . . . . Due administration of justice demands that the jury in passing on such grave questions should not be allowed to have injected in a case, either by evidence, remarks of counsel, or even by the conduct of the judge, any extrinsic matter that tends to create bias or prejudice. The evil effect of such matters is not always cured by the ruling of the court withdrawing them from consideration or even by rebuking counsel. The red-hot iron of prejudice as been thrust into the case; merely withdrawing it still leaves a festering wound. When there is no evidence to justify it, it is always improper for counsel to indulge in argument to the jury which tends towards the prejudice of one party or to the undue sympathy for the other.

*Calloway v. Fogel,* 213 S.W.2d 405, 409 (Mo. 1948) (citations omitted).

## IV.    Evidence of Medical Treatment/Conditions Unrelated to Plaintiff's Claimed Injuries Should Be Excluded.

Much of plaintiff's prior and subsequent medical treatment is irrelevant to the issues in this case and should be excluded.[5]  In this action, plaintiff's evidence will be that plaintiff developed neuropathic pain and numbness into her left groin area and into her thigh, resulting in an altered gait and referred pain into her back.  She also has pain and numbness into her perineum/vulva, and severe pain that essentially precludes sex.  Her condition is now permanent and chronic.  She has to take large doses of narcotic pain medication, which, due to the nature of neuropathic pain, does not completely relieve her pain.

Certainly plaintiff's prior medical records and conditions that bear upon her current complaints are fair game for the defendant.  These include her prior abdominal surgeries,

---

expert, **Dr. Chris Fevurly**, refers in his report to plaintiff's "chronic pain syndrome" hallmarked by, *inter alia,* "*disability* (pain contingent on financial compensation and pending litigation claims). Fevurly Report, p.12.

[5] Plaintiff has a long history of medical treatment, including intermittent visits to the doctor for neck pain, colds, flu, vein clinic/surgery in 1995, breast lumps, mammograms, a motor vehicle accident in 1996, tests for Chlamydia/Gonococcus, tubal sterilization ('97), migraine headaches, and chiropractic treatment on her neck/back.

abdominal complaints, and interstitial cystitis. But much of her other prior treatment is irrelevant and has no bearing on the issues in this case. Plaintiff's prior treatment for neck pain, colds, flu, vein clinic/surgery in 1995, breast lumps, mammograms, a motor vehicle accident in 1996, tests for Chlamydia/Gonococcus, tubal sterilization ('97), migraine headaches, dental care, jaw pain (from being hit), and most if not all of her chiropractic treatment on her neck/back, have no relevance to her current disability and should be excluded.

Admission of evidence of medical treatment or conditions that do not pertain to the parts of plaintiff's body in controversy will result in confusion of the issues and any probative value it may have is far outweighed by its unfair prejudice to the plaintiff. Evidence of such past medical conditions should be excluded under Rule 402 on the grounds of relevance, and to the extent that such conditions may be relevant, it should be excluded under Rule 403 in that its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and considerations of undue delay, waste of time, and needless presentation of cumulative evidence.

The records are voluminous and it will be very easy to overlook certain objectionable entries. In fairness, counsel and witnesses should be cautioned to limit disclosure to the jury of only records relating to issues in controversy, and not unrelated medical conditions.

## V.   Evidence of Ratings and Discussions of Impairment under the A.M.A. Guidelines should be excluded as irrelevant and likely to mislead the jury and confuse the issues.

Plaintiff has been rated by a treating physician, Dr. Steven Hendler, at 75% of the lower extremity. Dr. Fevurly, defendant's retained expert, has testified in his deposition and referenced in his report that plaintiff is not "impaired" within the context of the A.M.A. Guidelines for

assessing impairment and disability.  Since this is a medical malpractice case, and not a worker's compensation claim that is confined by the parameters of state law in terms of recovery and assessment of disability, evidence of permanent partial impairment ratings or the lack therefore should not be admitted.  The jurors are not being asked to assign a rating of disability under the Guidelines.  Any experience they may have in this regard should not be brought to bear in this case.  There will be no prejudice to the defense in this case, inasmuch as the physicians involved in this case are capable of describing the nature and extent of plaintiff's physical disability/medical condition without resorting to work comp ratings.  Such evidence also draws undue emphasis to plaintiff's claim for workers' compensation, which should not be admitted on other grounds, as discussed supra.

Accordingly, plaintiff requests to exclude from evidence Dr. Hendler's rating of 75% to the lower extremity, as well as any testimony from Dr. Fevurly concerning his evaluation and assessment of the plaintiff under the AMA Guides to impairment and his opinion that she lacks any identifiable impairment under those guidelines.  Any conceivable probative value such testimony may have is outweighed by the unfair prejudice to plaintiff and potential for misleading and confusing the issues in the minds of the jurors. Rules 402 and 403.

## VI.   **Excluding Testimony of Stanley Hoehn, M.D.**

Defendant has indicated he may call Dr. Stanley Hoehn as a witness in this case.  The defendant's synopsis of the substance of the facts of his testimony is "discussed surgery of plaintiff with Dr. Taylor."  Dr. Taylor in his deposition testified:

> Q.   Prior to seeing her in he hospital or at the Surgicenter, did you have a conversation with another doctor about her case?

A.    When you first asked me that question in the interrogatory, I didn't have a precise memory of having done so; but I do now have a recollection of -- because I was troubled – of talking in locker-room kind of conversation about -- You know, I don't know how it came up, because I don't usually do this, on hernias.  But I said, you know, "I got this patient, and" – I said -- I talked to him about her, and I said, "I've got her scheduled for a laparoscopy, but I just really don't think I want to do that."  And I remember him saying, "Well, I sure wouldn't do a laparoscopy on her."  Good enough for me.

Q.    Who was the conversation with?

A.    I'm pretty sure it was Dr. Stan Hoehn.

Taylor Depo, 45:16-25; 46:1-9

Dr. Hoehn has never seen plaintiff as a patient, nor been involved in her care.  There is no criticism levied against Dr. Taylor for performing an open operation as opposed to a laparoscopic procedure.  Dr. Hoehn has never been identified as an expert and no Rule 26 disclosures of his opinions or the basis for those opinions have ever been disclosed.  Any testimony he has would be hearsay, and would be irrelevant to any determination of the issues in this case.  No meaningful synopsis of his possible testimony has been disclosed.  The only possible purpose of putting Dr. Hoehn on the stand would be to elicit opinions from him to support Dr. Taylor's course of treatment.  Since he was not a treating physician, he has no basis to render any opinions with regard to plaintiff's care.  Dr. Hoehn should be precluded from testifying in this case.  Defendant should not be allowed an end run around the disclosures required of expert opinions.  See *eg.*, *Patterson v. Seib*, No. 04-2513-KHV, Kathryn Vratil, District Judge (Kan. 2005)(expert reports necessary from treating physician if party intends to elicit testimony which goes beyond the facts made known to them during the course and care of treatment).

**VII.     Character evidence of Dr. Taylor should be excluded.**

Dr. Taylor's character is not on trial.  The issue is whether he exercised the appropriate standard of care under the facts and circumstances of this particular case.  His failure to exercise the standard of care is not a reflection upon his character.  In discovery, defendant has asked some of plaintiff's other treating physicians if they are familiar with Dr. Taylor's reputation.  So far no one has.  At trial, such testimony should not be allowed since character is not in issue. Rules 402-404.

**VIII.    Evidence of "hyperalgesia" should be excluded in that it is irrelevant and any potential relevance it may have is outweighed by its unfair prejudice to plaintiff.**

Last week defendant deposed Dr. Shavonne Danner, a anesthesiologist/pain management physician, who saw plaintiff on three brief occasions between November and December, 2002. Defendant asked here whether she had any concerns about long term use of opiods/narcotic pain medication, and the doctor stated, *inter alia*,:

> "[t]here's now literature that there's a syndrome, opioid-induced hyperalgesia...that creates a lessening of the patient's ability to tolerate pain and even pressure type sensations maybe pursued as pain."

Danner Depo. 26:5-11.  While "the period of time has not been well–defined" [Danner 26:22-25], Danner stated that patients who had been on opioids for a year "could" be at risk for developing hyperalgesia.   [Danner 27:11-16].   She did not recall what the medical literature studies were in terms of how long a period of time was at issue before that happens.  [Danner 27:1-6].   Moreover, she conceded on cross-examination she did not make and record that diagnosis with regards to the plaintiff, when she treated her. [Danner 94:11-16]

No doctor has diagnosed or told plaintiff that she has hyperalgesia; not even defendant's retained expert, Dr. Chris Fevurly, who has concluded she has virtually every other conceivable condition (other than neuropathic pain from the severed nerve).   To allow Dr. Danner's

15

testimony on this topic would be to mislead and confuse the jury. The testimony is irrelevant because no such diagnosis has ever been made of plaintiff. It is prejudicial because defendant's theory is that plaintiff is taking too many opioids and that is the cause of her pain. If she even had such a condition, although no doctor has diagnosed it, it could just as easily be brought on by the extensive narcotic pain medications she has had to take to deal with the neuropathic pain stemming from the surgical trauma and injury to her ilioinguinal nerve. Since no such diagnosis has ever been made, however, there is no point in injecting the issue and engaging in speculation in front of the jury as to whether she has it. Such evidence would give the jury a roving commission to make their own diagnosis. And it would be untimely at this juncture for defendant's expert(s) to adopt this theory on the eve of trial, having submitted reports and been deposed.

For these reasons, defense should be barred from offering such speculative evidence or arguments in support of the speculative theory of "hyperalgesia" as a cause of plaintiff's pain/sensitivity in this case. Rules 402 and 403.

IX.    **Plaintiff's Objections to and Motion to Exclude from Evidence Particular Entries Contained in the Medical/Business Records.**

Based on the foregoing, plaintiff seeks to exclude from evidence including but not limited to the following objectionable medical conditions and medical records:

A.    **Medical Records: Thomas Taylor, M.D.**

Plaintiff moves to exclude the following from Thomas Taylor, M.D.'s records:

(i) Cover page – not a part of his record and contains references to insurance and work comp.

(ii) p. 010000, references to insurance.

(iii) 010025-46, references to work comp and insurance.

(iv) 010048-51, plaintiff's request for records.  Irrelevant. Hearsay. Not a business record.

**B.      Medical Records: Paul Torres, M.D.**

(i)      Cover Sheet – not a part of the doctor's records, and mentions insurance.

(ii)     020006-020007, insurance payments. co-pays suggestive of insurance,

**C.      Northland Surgical (Dr. Epstein)**

(i)      Cover Sheet – not a part of the doctor's records

(ii)     030008 – omit only references to work comp insurance, adjustments, charges for medical records.

**D.      Kansas City Urology Care (Dr. Gerald Park)**

(i)      040002  - huge entry relating to Insurance.

(ii)     ----, last entry "I am aware of litigation…"  Irrelevant, unfairly prejudicial.  And not a note made pertinent to care of patient.

**E.      Northland Anesthesiology**

(i)      050000 – all entries from 1999 through 2002, irrelevant (precede neurectomy)

(ii)     All references to payments, work comp payments, United Healthcare, and/or insurance.

(iii)    050000-06

**E.      Surgicenter of Johnson County (neurectomy)**

(i)      Omit cover. Contains editorial summaries of defendant regarding contents.

(ii)     060000-01  – omit references to insurance and to Gallagher Bassett, Responsible Party, Employer, Policy information, etc.

**F.      North Kansas City Hospital**

(i)      Omit Cover Sheet – not part of record.  References irrelevant records.

(ii)     070000-007, motor vehicle accident 1996.  Irrelevant.  Unfair prejudice.
References to insurance on pages 070000, 070001, 070003,

(iii)    070008-058, upper abdominal pain and RLQ pain from June through August,
1999 due to ovarian cyst, irrelevant and unfair prejudice.  Insurance references on
pages 070008, 070009, 070020-21, 070028-09,

(v)     070059-96, ER –1.19.00 to 1.20.00 – pyelonephritis, nausea and vomiting, back
pain radiating to front. Irrelevant, unfair prejudice.  References to insurance on
pages 070059.

(vi)    070097-070103 – ER, RUQ pain.  Irrelevant and unfair prejudice.  Insurance on
page 070097.

(vii)   070104, 070109 – insurance references.

(viii)  070110, 070138, 070139-40, 070148 – insurance references

(ix)    070144 – "This pain is a result of a work related accident.  No"
If yes, etc.; If yes, etc., Do you plan to pursue legal action or insurance settlement
in the future?"  Irrelevant, unfairly prejudicial.

(x)     070149, 070152, 070154, 070157 – insurance references.

(xi)    070155: references to insurance delaying hernia surgery.  Unfair prejudice.
Irrelevant.
070158: "Litigation: There is some litigation pending over this problem. This was
not elucidated."  Irrelevant and unfair prejudice.  Not necessary for treatment.
Hearsay.
070161 "cc: Gallagher Bassett"
070163: "Is this the pain of a work related accident? Yes / If Yes......If No....in
the future?
070167  Insurance references.

(xii)   070168  Insurance/Work Comp references
(xiii)  070170 reference to "workman's compensation"
070218 Insurance references.
070219 Insurance references.
070220-21 cc: Gallagher Bassett
070228  Insurance references
070229-30 Gallagher Bassett
070237  Insurance references
070239  Gallagher Bassett
070247  Insurance references
070249 Insurance references

070251-52  Gallagher Bassett
070259 Insurance references
070260 Insurance references
070262  Gallagher Bassett
070269-70 Insurance references
070272 Gallagher Bassett
070273  Insurance references
070275  Gallagher Bassett
070277 Gallagher Bassett
070284-85  Insurance
070292  Insurance, work comp, co-pay
070311 Insurance
070312 Insurance
070313 Gallagher Bassett
070330-31 Insurance
070333-34 Gallagher Bass
070337  Insurance
070341-42  Insurance
070347 Insurance
070356 Gallagher Bassett
070358 Gallagher Bassett
070366-67 Insurance
070369-70 Gallagher Bassett
070380-81 Insurance
070382  Gallagher Bassett
070388 Insurance
070431-32 Insurance
070434 Gallagher Bassett
070435 Gallagher Bassett
070443-44 Insurance
070447 Gallagher Bassett
070450  Insurance
070455 Insurance
070459-60 Insurance
070463 Insurance
070466 Insurance
070498-99 Insurance
070501 Insurance
070515 Insurance
070518 Insurance
070522 Gallagher Bass
070527 Insurance
070530 Insurance
070539 Insurance
070542 Insurance
070549 Insurance

070554 Insurance
070564-65 Insurance
070568 Insurance
070570 Insurance
070585 Insurance

(xiv) **Path Bill**
080003 Path Bill – Insurance.  Bill not claimed in this case.

(xv) **Hendler Records**.
Cover sheet
090000 Insurance
090005 reference to report to Betts and Genex
090029  disability rating, irrelevant, unfairly prejudicial, misleading, and confusion of issues.
090059-60 and 65-69 and 76-78 Letter from Genex re: rating/Gallagher Bassett.  Insurance/misleading, confusion of issues.
090100, 103-104, 106, 107, 112, 113,  115, 118, 120,  (Gallagher Bassett)
090141-142,  Insurance/Work Comp info.
090148-171 requests for records.  Not business/medical record.
BILL – 090172- omit references to payments/adjustments/insurance

(xvi) **Heartland Surgical**
cover sheet (billing reference) bill not claimed, irrelevant.
100002 – 03.  Bill

(xvii) **GASHLAND CLINIC**.
110000-01 cough, bronchitis.  Irrelevant.
110011 "I told her to contact her insurance, United Healthcare, to see what she could do to make this happen."  Insurance reference.
110056, 58-60, 62, 64,  Gallagher Bassett

(xix) **ENCOMPASS**
cover page
120000 oral contraceptives.
120003 chest infection/URI
TOO MANY PAGES TO ITEMIZE

(xx) **Dr. Riojas**
between 130060 and 61 is an affidavit with no bate stamp. Remove it.

(xxi) **OHS Compcare**
cover page – remove. references to work comp.

(xxii) **Surgicenter of KC** 150000-023

vein surgery and tubal sterilization.  All records irrelevant.
Cover sheet
5, 17, 22, 23 Insurance

xxiii   **Steffen Chiropractic**
all records irrelevant
bills irrelevant – not claimed

xxiv   **CVS pharmacy**
eliminate insurance information (primary/secondary payments, etc.)

xxv   **Albertson's Drug Division (Costco)**
180010-14 insurance references/amounts paid.

xxvi   **Dr. Griebling**
No objections.

xxvii   **Northland Oral & Maxillofacial Surgery**
Object to all records – irrelevant. Dental records.
Cavity. Tooth pulled. Insurance references.

xxviii   **Seaport Family Dentistry**
Object to all records – irrelevant. Dental records. TMJ, partials. Abscesses.
3.30.00  got hit at gas station with fist to right side of jaw.  Irrelevant. Prejudicial.
Insurance references.
26-72 Billing not claimed; insurance references.

xxix   **The Rehabilitation Institute**
Cover sheet, work comp insurance references.
230023 insurance/comp

xxx   **Gashland Clinic Update**
no objection

xxxi   **GENEX** – 238 pages
replete with insurance, work comp claim, billings.
(numerous records from health care providers – incorporate objections to them)

xxxii   **MO Work Comp Claim**
object to all.  Irrelevant.

xxxiii   **Landmark Medical Center**
irrelevant.  Affidavit of no records.

WHEREFORE, plaintiff prays the Court to instruct defendant, his counsel and witnesses, that they shall not inject, within the presence or hearing of the jury, such facts and matters as outlined above.

/s/ Russell S. Dameron
Russell S. Dameron,   MO# 33055; KS Fed. # 70601
WATSON & DAMERON, LLP,
2500 Holmes Street
Kansas City, Missouri 64108-2743
(816) 474-3350
FAX:  (816) 221-1636
russ@kctriallawyers.com

**ATTORNEYS FOR PLAINTIFF**